UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

REBECCA SMITH,                        :
                                      :
        Plaintiff,                    :
                                      :
        v.                            :    Case No. 2:10-cv-176
                                      :
Commissioner of Social Security,      :
                                      :
        Defendant.                    :
                                      :

### Memorandum Opinion and Order

Pursuant to 42 U.S.C. § 405(g), Plaintiff Rebecca Smith seeks judicial review of the final administrative decision of the Commissioner of Social Security ("Commissioner") denying her claim for Social Security disability benefits and Supplemental Security Income ("SSI").  On the parties' cross-motions to reverse and to affirm the decision of the Commissioner, Smith's motion, ECF No. 5, is **granted**, and the Commissioner's motion, ECF No. 6, is **denied**.

## I.   Background

At the time her claim was denied Smith was thirty years old. She had a graduate equivalency degree, and had worked at a variety of jobs, including hospital billing clerk, data entry clerk, sales associate, waitress, cashier, and child care attendant.  She had a ten-year-old son and was living with her parents.  She alleged a disability onset date of July 31, 2006, due to anxiety with panic attacks and agoraphobia, depression and

arthritis.  She also suffered from post-traumatic stress disorder ("PTSD") and chronic severe migraines.

### A.   Procedural History

Smith applied for disability insurance benefits and SSI benefits on May 10, 2007.  Her application was denied on September 13, 2007, and she requested review by a federal reviewing official.  Admin. R. ("AR") 56-59, 85.  Her claim was again denied.  AR 89-91.

Smith requested a hearing before an Administrative Law Judge ("ALJ"), and appeared before ALJ Frederick Harap at a video hearing on June 25, 2008.  AR 63.  The ALJ found that Smith was not disabled within the meaning of the Social Security Act ("SSA") in a decision dated July 2, 2008.  AR 63-71.

The Decision Review Board ("DRB") selected Smith's claim for review, and in an order dated October 22, 2008, vacated the decision and remanded her case for, among other things, evaluation of her treating physician's opinion that she suffered from severe anxiety complicated by panic attacks and agoraphobia, that became incapacitating when she appeared in public.  AR 73.

At a video hearing before ALJ Robert S. Klingebiel on November 3, 2009, Smith, represented by counsel, provided testimony, as did a vocational expert.  AR 22-55.  In a decision dated February 11, 2010, ALJ Klingebiel also determined that Smith was not disabled within the meaning of the SSA.  AR 4-21.

2

This decision became the final decision of the Commissioner when the DRB did not complete its review of Smith's claim within the time allowed.  AR 1-3.

**B.   Medical History**

Smith has a history of mental disorders, and has obtained periodic treatment since approximately age 18.  AR 10.  When Smith was in the fourth grade her older brother regularly physically and  psychologically abused her.  This lasted into her teens, and she remains frightened of him.  AR 418, 554.

Smith attended a residential substance abuse program in 2002 for treatment of alcohol addiction and cocaine dependence.  AR 914.  At the time she was diagnosed with severe alcohol dependence and polysubstance abuse.  AR 489.  A mental status evaluation in February 2003 from her counselor, licensed psychologist Maryann Neuzil, assessed her as depressed, at severe risk for alcohol, drug and polysubstance abuse (at that time in remission), and suffering from anxiety and panic disorder.  AR 489-93.

In May 2005 Smith was referred to Fletcher Allen Health Care's ("FAHC") emergency department for a medical clearance to enter a detoxification program to address narcotics abuse.  AR 787.  Smith's primary care provider during this period was Dr. Ann Goering at Winooski Family Health.  The Winooski Family Health records reflect a diagnosis of opiate abuse, PTSD and

3

anxiety.  AR 465.

In November 2005, during a period of abstinence from alcohol and opiate abuse, the symptoms of her anxiety worsened, to the point that she felt unable to leave the house.  AR 458-59.  These symptoms persisted through April 2006, despite changes in anti-anxiety medications and increases in dosages.  AR 451-58.  In October 2006 she experienced recurrent bouts of severe migraines.  AR 445-46.  She was evaluated in November 2006 by FAHC's Division of Pain Management for chronic bilateral jaw pain and severe headaches, and scheduled for an oral surgery evaluation for temporomandibular joint pain.  AR 761.  She received treatment for severe migraine headaches in the emergency department in January 2007, and several times thereafter in 2007 and 2008.

During this period she was prescribed Vicodin, a combination of acetaminophen and hydrocodone.  AR 320-21, 346-47, 353, 356, 358.  She also received Dilaudid, or hydromorphone.  AR 348, 354, 363-64.  Both drugs are opioids.  In addition, Smith was snorting oxycodone.  AR 379.  In April 2007 Smith received treatment for opiate withdrawal.  AR 379, 441, 716.  The record does not reflect any relapse from recovery since that date.

Dr. Goering provided a medical report for Smith's disability application on June 12, 2007.  She gave diagnoses of anxiety, panic disorder and PTSD, with alcohol and opiate abuse.  AR 413.  On July 30, 2007, Maryann Neuzil supplied a diagnosis as of

4

February 2007 of Axis I[1] disorders of polysubstance dependence, generalized anxiety disorder, and PTSD.  AR 415.  She noted that she had insufficient information to make any diagnostic judgment about an Axis II diagnosis.

A consultant from the Vermont Office of Disability Determination Services ("DDS"), Rae Anne Barry, Ph.D., performed a mental status examination and assessment of Smith in August 2007.  During the examination, Smith appeared "quite timid with extremely restrictive movements," needed "encouragement to complete tasks," and "was tense and shaky and asked to have the window open because it made her feel better."  She "feel[s] people staring at her, feels something will happen, somebody will do something to her, or they will take her son."  AR 417.  Dr. Barry recorded that Smith gets up early in the morning, and feels compelled to check on her son to make sure he is breathing, checks the cats, doors, and windows, looks for footprints, checks her car and the tires.  She has limited social contact, and does her grocery shopping once a month late at night to avoid people. She has "questionable" money management skills; has no hobbies or interests, although she likes to organize things, and to have all the labels on the cans facing forward.  AR 417-18.

---

[1]   There are five axes included in the DSM-IV multiaxial classification.  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 25-27 (4th ed. 1994) ("DSM-IV").   A clinician records clinical disorders on Axis I, and personality disorders on Axis II.  *Id.*

5

Smith reported to Dr. Barry that she was afraid of her father, an alcoholic, and hated her mother because she left Smith at home with her abusive older brother.  She left her last job as a billing clerk after six months because she could not stand working in a cubicle, and she believed her co-worker was rude. Prior to that job she had attempted to work at several jobs, but was unable to continue at each because of panic and anxiety.  Dr. Barry noted that "although she is making great effort," "[s]ocial skills are marginal," "[s]he appears frightened and anxious," "[h]er body is tight," [s]he sweats and she is very tense admitting to wanting to leave and go home where she feels relatively safe."  AR 418.  Smith also reported symptoms of depression, specifically having trouble getting out of bed, turning off her phone to avoid contact, poor appetite and poor sleep.  She reported a suicide attempt by drug overdose the previous year.  AR 417.

Dr. Barry found deficiencies in Smith's memory and concentration.  AR 418.  She found inconsistencies in Smith's account of substance abuse and therefore did not assess her current level of substance abuse.  Dr. Barry's diagnosis was PTSD, alcohol dependence in remission and opioid dependence in questionable early remission.  AR 419.

In May 2008 Smith's treating physician, Jessica Rouse, provided a Medical Source Statement of Ability to do Work-Related

6

Activities (Mental).  Although Dr. Rouse considered that Smith had no limitations in her ability to interact appropriately with supervisors, co-workers and the public, she stated: "Currently Ms. Smith has very severe anxiety complicated by panic attacks and agoraphobia.  She develops panic attacks which are incapacitating whenever she has to be in public."  AR 501.  In her opinion, this impairment would cause her to be absent from work more than four days per month.  She believed that with medication and therapy "this is a temporary condition that can be managed."  AR 502.

Smith obtained an outpatient psychiatric evaluation in July 2008 from Dr. A. Evan Eyler.  To him she reported constant severe anxiety, and waves of depression, with occasional episodes of elevated mood.  She reported experiencing panic episodes several times a day, times of emotional numbness, and bouts of irritability.  Dr. Eyler considered that Smith met diagnostic criteria for PTSD, and had symptoms of obsessive compulsive disorder ("OCD").  Although she had thoughts of suicide, and had made more than five attempts in the past, she denied any intent to act on her thoughts currently, because of the likely impact on her son.

Dr. Eyler gave the following diagnoses:  polysubstance dependence, in remission; PTSD; panic disorder with agoraphobia; probable cyclothymia; probable obsessive-compulsive disorder;

probable eating disorder, in remission.  AR 554.  Dr. Eyler
recommended an intensive outpatient program.  He endorsed Dr.
Rouse's prescription of an SSRI agent such as sertraline, as well
as the antipsychotic drug quetiapine.  AR 555.  With regard to
whether Smith could work, Dr. Eyler opined:

> On the one hand, it is difficult to imagine Ms. Smith
> maintaining regular and gainful employment with her
> current level of symptoms.  On the other hand, she is
> currently spending far too much time isolating herself
> from others, and it is entirely possible that, with her
> own resources, she would put into play a lifestyle in
> which she has no social contact with anyone but her
> son.

*Id.*

In July 2008 Smith's counselor, licensed psychologist Amy
Tree, provided a summary of their six psychotherapy sessions,
from May 22, 2008 to June 30, 2008.  The therapist considered
that she suffered from PTSD, depression, anxiety, panic attacks
with agoraphobia, and severe migraines.  AR 524.  She summarized
a history of abuse and trauma in Smith's childhood and adulthood,
and reported that each time she met with Smith, she began her
sessions "shaking with fear."  *Id.*  Tree observed that Smith had
a panic attack when she had trouble opening an exit door from the
therapist's office building.  *Id.*  She reported that Smith
believes that people make nasty comments to her when she walks
by, and shops for groceries at night in order to avoid people.
Her panic attacks produce feelings of helplessness, followed by
anger.  She has lost jobs as a result of her behavior when angry,

8

and feels unable to work until her mental health stabilizes.  *Id.*
In addition, Smith experiences significant pain from severe
migraines, which occur three to four times a week, and last up to
several hours.  *Id.*

In September 2009, Tree provided a further summary of ten
psychotherapy sessions with Smith from July 3, 2008 to December
4, 2008.  Her diagnosis was unchanged.  Smith declined to
participate in a drug rehabilitation program or in intensive
outpatient group therapy.  She missed several therapy
appointments.  By the last appointment that Smith attended, she
appeared to be less depressed, more confident and somewhat
optimistic.  AR 913.

In October 2009, Smith's new counselor, Lani Gerrard,
provided office notes of their seven sessions between September
16, 2009 and October 28, 2009.  She described Smith as suffering
from anxiety, panic, depression, auditory hallucinations and
paranoia.  They, along with Smith's primary physician, had been
attempting to locate suitable intensive treatment for Smith, but
Smith did not feel able to attend a group program, given her
symptoms.  Gerrard stated that "with the range of symptoms and
level of severity she reports experiencing, . . . Rebecca would
have much difficulty holding down a job." AR 916.  Smith
reported negative thoughts and suicidal thoughts, hearing voices
that said bad things to her, difficulty remembering, feelings of

unreality and loss of control.  AR 918-26.

Office notes from Smith's treating physician, Dr. Michelle Paavola,[2] from July to October 2009 reflect that Smith was receiving ongoing treatment for anxiety, depression and temporomandibular joint pain following surgery in May.  AR 925-33.  Dr. Paavola recorded that Smith "feels that she is empty and is just going through the motions of life," "has no interest in doing the things that she normally would do," is "not able to concentrate," and often thinks about suicide, although denying that she would act on these thoughts.  AR 932.  She continues to have panic attacks especially when she is in a stressful situation at home or whenever she has to go to the store.  AR 929.  Dr. Paavola assessed her as having a history of anxiety with panic attacks, depression and PTSD, as well as likely obsessive compulsive disorder.  AR 928, 933.  She prescribed quetiapine for depression, and sertraline and clonazepam for anxiety.  AR 928, 930, 933.

In an office visit on October 7, 2009, Dr. Paavola recorded that Smith was experiencing increased anxiety, and that she was hearing voices saying negative things about her and about her boyfriend.  She had been having more thoughts of suicide.  She reported that she had begun drinking alcohol as a child to escape

_____

[2]  Dr. Paavola replaced Dr. Rouse after Dr. Rouse completed her residency.

10

the voices and to take herself to a different place.  AR 927.
Smith was also having difficulty sleeping because of the voices
and her need to check on her son every few hours.  *Id.*  Dr.
Paavola noted that Smith displayed symptoms of anxiety during the
office visit, and assessed her increased anxiety as having some
psychotic features.  AR 928.

### C.  Proceedings before the ALJ

At the hearing before the ALJ on November 3, 2009, Smith
testified that she was scheduled for an inpatient psychiatric
consultation at FAHC's psychiatric unit.  Her doctor felt it
necessary to obtain an evaluation of her auditory hallucinations,
anxiety and depression, and of her medications.  She stated that
she had been hearing voices for three or more years, but that she
had not wanted to admit this for fear of losing custody of her
son.  AR 30.

Smith stated that she did not socialize, other than seeing
her boyfriend.  She no longer went shopping and she had trouble
sleeping.  She described fighting with her boyfriend:

> I swear that he says stuff to me like stupid, or that I
> look like a slut or something.  And he swears he didn't
> say it.  In reality I know that he's not the type to
> say something like that.  But it's so clear when it's
> said that I can look at him and almost see his mouth
> moving, like he is saying it.  And then he gets angry
> because he didn't say it, then it just escalates from
> there.

AR 33.  She described that when she would get a job, initially
she would be excited to work, but before long she would be unable

to sit still and be unable to stay in the building.  Instead of admitting her difficulties, she would cause a problem and get herself fired.  AR 33-34.

A vocational expert testified that Smith's past work would be classified as sedentary, light or medium exertion, semi-skilled.  AR 40-41.  The ALJ asked the vocational expert to assume a person with Smith's education and work history who had no physical limitations, but would be best suited for unskilled jobs that could be learned in a relatively short period of time and did not require waiting on the public.  He noted that all of Smith's previous work would be precluded under that hypothesis. The vocational expert testified that examples of jobs that fit the hypothesis were cleaner and stockroom marker, and that these jobs existed in Vermont as well as in the national economy.  AR 41-44.

The vocational expert was then asked to assume a person who "undertake[s] a new job with excitement, and then over a period of time one to two weeks because of her psychological issues self-destructs on the job."  He stated that "a person with the types of problems [that] she's experiencing would not be able to maintain employment," and that she would be referred to vocational rehabilitation.  AR 47-48.

**D.   The ALJ's Decision**

In making his determination, the ALJ used the five-step

12

sequential process for evaluating a claim of disability set forth in 20 C.F.R. §§ 404.1520 and 416.920.  At step one, the ALJ found that Smith had not performed any substantial gainful activity since July 31, 2006, the alleged onset date.  AR 9.  At step two, the ALJ found that Smith had "severe" impairments of anxiety and polysubstance abuse.  AR 9.

At step three however, the ALJ concluded that Smith's impairments did not meet or medically equal the criteria of an impairment listed in appendix 1 of 20 C.F.R. Part 404, Subpart P.  AR 12.  *See* 20 C.F.R. §§ 404.1520©, 416.920©.  Having found that Smith's impairments did not meet or equal a listed impairment, the ALJ considered whether Smith retained the residual functional capacity ("RFC") to perform her past work or any other work.  *See* 20 C.F.R. §§ 404.1520(e)-(g), 416.920(e)-(g).  The ALJ found that Smith retained the RFC to engage in unskilled work at all exertion levels that did not involve public contact.  AR 13.

At step four, the ALJ concluded that Smith was unable to return to any past relevant work due to her impairments.  AR 14.  At step five, the ALJ concluded that Smith could make an adjustment to other work that exists in significant numbers in the national economy, however.  He relied on the testimony of the vocational expert to conclude that such occupations included cleaner and stockroom marker.  AR 15.  As a result, the ALJ concluded that Smith was not disabled within the meaning of the

SSA at any time from her alleged onset date through the date of his decision.  AR 15.

## II.  Standard of Review

Upon a timely request for review of a final decision of the Commissioner, a district court is authorized to enter a judgment affirming, modifying, or reversing the Commissioner's decision, with or without remanding the cause for a rehearing.  42 U.S.C. § 405(g).  The Commissioner's determination may be set aside only for legal error or findings that are not supported by substantial evidence.  *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000).  Findings of fact, if supported by substantial evidence, are conclusive.  42 U.S.C. § 405(g); *see Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002).  "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  20 C.F.R. §§ 404.901, 416.1401; *see Veino*, 312 F.3d at 586 (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  "Where the Commissioner's decision rests on adequate findings supported by evidence having rational probative force, [a reviewing court] will not substitute [its] judgment for that of the Commissioner."  *Id.*  "Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings 'must be given conclusive effect' so long as they are supported by substantial evidence."  *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010)

14

(quoting *Schauer v. Schweiker*, 675 F.2d 55, 57 (2d Cir. 1982)).
An ALJ has an affirmative "'duty to investigate and develop the
facts and develop the arguments both for and against the granting
of benefits.'" *Moran v. Astrue*, 569 F.3d 108, 113 (2d Cir. 2009)
(quoting *Butts v. Barnhart*, 388 F. 3d 377, 386 (2d Cir. 2004)).

## III. Discussion

Smith contends that the ALJ failed to consider medical
evidence of record, failed to give appropriate weight to the
opinion of a treating physician or to explain the weight given,
substituted his opinion for that of the treating physician, and
failed to consider her ability to perform sustained work
activity, requiring remand for a new hearing.  Because it is
unclear toward which of the adverse findings and conclusions
Smith is directing her first three objections, the Court will
deem that she challenges all of them:  the step two and three
determination of impairment and its severity, the RFC
determination, and the step five determination that Smith could
make an adjustment to other work.

### A.   The Step Two & Three Determination of Impairment and its Severity

The ALJ determined that Smith had two severe impairments:
anxiety and polysubstance abuse.  He rejected migraine headaches
as a severe impairment.  He made no findings with respect to
depression, PTSD, or panic disorder, although Smith's medical
records contained numerous references by her treating physicians

15

and therapists to these conditions.

The ALJ was obligated to evaluate every medical opinion, and to give a treating source's opinion controlling weight if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(d), 416.927(d)(2); *see, e.g.*, *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008). Furthermore, given an ALJ's affirmative duty to develop the administrative record, an ALJ may not reject or ignore a treating source's diagnosis as insufficiently supported without attempting to obtain more information to supplement the administrative record. *See id.* at 129; *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999).

Dr. Ann Goering, Smith's treating physician from 2005 through 2007, gave a diagnosis of anxiety, panic disorder, and PTSD, with alcohol and opiate abuse. AR 413. Smith's therapist during that time period, licensed psychologist Maryann Neuzil, gave a diagnosis of polysubstance dependence, generalized anxiety disorder and PTSD. AR 415. Dr. Jessica Rouse, Smith's treating physician in 2008, gave diagnoses of depression, anxiety, panic, agoraphobia and migraine. AR 518, 520. Licensed psychologist Amy Tree, who saw Smith in 2008, gave diagnoses of PTSD, depression, anxiety, panic attacks with agoraphobia, and severe migraines. AR 524. Dr. Michelle Paavola, who replaced Dr. Rouse

as Smith's treating physician in 2009, gave diagnoses of anxiety, anxiety with panic, depression, PTSD and likely obsessive compulsive disorder.   AR 927-33.

Two additional acceptable medical sources provided evidence of these additional impairments:   Dr. Barry, Ph.D., who saw Smith in 2007, and Dr. Eyler, who saw Smith in 2008.   Dr. Barry diagnosed PTSD, alcohol dependence in remission and opioid dependence in questionable early remission.   AR 419.   Dr. Eyler diagnosed polysubstance dependence in remission, PTSD and panic disorder with agoraphobia.   AR 554.

Despite the consistent medical evidence of multiple mental impairments, the ALJ made no findings with respect to the existence or severity of these conditions.   The ALJ was required to determine the combined effect of Smith's impairments, 20 C.F.R. §§ 404.1523, 416.923, and was required to follow a "special technique" when evaluating the severity of her mental impairments.   *Id.* §§ 404.1520a(a)(2010), 416.920a(a)(2010); *see also Kohler v. Astrue*, 546 F.3d 260, 265-66 (2d Cir. 2008). Under the special technique, once a medically determinable mental impairment is found, the ALJ must "specify the symptoms, signs, and laboratory findings that substantiate the presence of the impairment(s)," and "rate the degree of functional limitation resulting from the impairment . . . ."   20 C.F.R. §§ 404.1520a(b)(1), (2); 416.920a(b)(1), (2).   The degree of

functional limitation is rated in four broad areas:  activities
of daily living; social functioning; concentration, persistence
or pace; and episodes of decompensation.  *Id.* §§ 404.1520a(c)(3),
416.920a(c)(3).  The ALJ's decision must include, among other
things, a specific finding as to the degree of limitation in each
of these functional areas.  *Id.* §§ 404.1520a(e)(2),
416.920a(e)(2).[3]

Considering only the impairments of anxiety and substance
abuse, the ALJ concluded that Smith had "mild" restrictions with
respect to activities of daily living; "moderate" restrictions
with respect to social functioning; and "moderate" restrictions
with respect to concentration, persistence or pace.  The ALJ made
no findings with respect to episodes of decompensation.  AR 13.

The ALJ arrived at these conclusions by citing to portions
of Smith's testimony and submissions.  He did not explain his
apparent rejection of other record evidence.  For example, with
respect to social functioning, the ALJ stated that Smith reported
"difficulties being in crowds and interacting with others,
however, she is able to go out in public, take her son to school,
and maintain socially appropriate behavior in public."  AR 13.
He did not evaluate the evidence that she had poor relationships
with family members, difficulties in her relationship with her

---

[3]  This provision is now found in 20 C.F.R. §§
404.1520a(e)(4), 416.920a(e)(4).

boyfriend, no friends other than her boyfriend, repeated loss of employment, fear of being in public places, and fear of interacting with strangers.  The DDS consultant, Dr. Barry, described Smith's social skills as "marginal," and social contacts as "poor."  AR 418.  This would appear to be inconsistent with the ALJ's conclusion that Smith has only "moderate" difficulties in social functioning, yet the ALJ did not explain his reasons for ignoring Dr. Barry's opinion.

As another example, with respect to activities of daily living, the ALJ stated that Smith reported "she is able to tend to her personal care and her son's care, do household chores, and do grocery shopping."  AR 12.  He did not evaluate the evidence that she shopped for groceries only once a month and at night, ignored bills, neglected her medical and psychological care, and did not use the telephone.  Dr. Barry described Smith's self-care as "marginal," as well.  AR 418.  Again, this would appear to be inconsistent with the ALJ's conclusion that Smith has only "mild" difficulties with activities of daily living, yet he did not explain his reasons for ignoring this opinion.

The failure to evaluate the medical evidence of additional mental impairments, the failure to evaluate the severity of multiple mental impairments, and the failure to explain the apparent rejection of medical opinions concerning the severity of these impairments was legal error.  *See* 20 C.F.R. §§ 404.1520a,

19

404.1523, 404.1527(d).  These errors prevent the Court from
ascertaining whether substantial evidence supported the ALJ's
decision to deny Smith's application.  Remand is therefore
required.  *See, e.g.*, *Burgin v. Astrue*, 348 F. App'x 646, 647-49
(2d Cir. 2009) (summary order); *Kohler*, 546 F.3d at 268-69
(remanding where failure to adhere to regulations did not permit
court to determine whether ALJ's decision reflected application
of correct legal standards and was supported by substantial
evidence); *Burgess*, 537 F.3d at 130 (remanding because the ALJ
failed to give good reasons for not crediting a treating source's
opinion); *Halloran v. Barnhart*, 362 F.3d 28, 32-33 (2d Cir. 2004)
(per curiam) (noting that remand is appropriate when the
Commissioner has not provided good reasons for the weight given
to a treating source's opinion).

### B.   The RFC Determination

Dr. Rouse provided an assessment of Smith's ability to work
on a sustained basis on a standard checklist form.  She checked
boxes indicating that Smith's ability to understand, remember and
carry out simple or complex instructions, and her ability to
interact appropriately with supervisors, co-workers and the
public, were unimpaired.  She also wrote, in answer to the
question whether any other capabilities were affected by the
impairment, that Smith suffered from "very severe anxiety
complicated by panic attacks and agoraphobia.  She develops panic

attacks which are incapacitating whenever she has to be in public." AR 501.  Dr. Rouse identified the factors that supported this assessment, specifically her direct observation of symptoms of Smith's condition.  She believed that this impairment would cause Smith to be absent from work more than four days per month, although she also felt that with appropriate medications and therapy Smith's condition would prove temporary and manageable.  AR 502.  The ALJ "discount[ed] her opinion as not supported by the substantial weight of the objective medical evidence of record."  AR 14.

It is not clear whether the ALJ rejected Dr. Rouse's opinion because it appeared internally inconsistent, or whether some other unspecified "objective medical evidence of record" contradicted Dr. Rouse's opinion that Smith suffered from incapacitating panic attacks in public.  There is substantial record evidence of Smith's panic attacks, not only from her own descriptions, but from the observations of Dr. Rouse during office visits, AR 514, Dr. Barry during her consultation, AR 418, and Ms. Tree following a therapy session.  AR 524.

On remand from the DRB, the ALJ was directed to give further consideration to Dr. Rouse's opinion that Smith's panic attacks were incapacitating, rendering her incapable of sustaining substantial gainful activity, and to explain the weight given to this opinion.  AR 73-74.  Instead, the ALJ failed even to mention

21

Dr. Rouse's opinion that Smith suffered from incapacitating panic attacks, and declined to offer any substantive explanation.  If the ALJ believed that Dr. Rouse's observation of incapacitating panic attacks was inconsistent with her observation that Smith could interact appropriately with the public, he was authorized by the remand order—as well as his affirmative duty to develop an adequate record—to request additional evidence and/or clarification.

A treating physician's opinion is entitled to controlling weight if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence."  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  An ALJ who does not give controlling weight to the opinion of a treating physician must offer "good reasons" for declining to do so.  *Id.; see Snell*, 177 F.3d at 133.  Merely reciting the catchphrase "not supported by the substantial weight of the objective medical evidence of record," without further explanation, does not equate to supplying good reasons for rejecting the opinion of a treating physician.  *See Burgess*, 537 F. 3d at 132 (remanding for "a comprehensive statement as to what weight is given and of good reasons for the ALJ's decision").

The Government argues that the ALJ only rejected that portion of Dr. Rouse's opinion that determined that Smith could not perform sustained work activity because she would be absent

from work more than four days per month.  The reason that Dr.
Rouse checked the box in question 7 indicating that Smith would
miss more than four days of work per month was her opinion
responding to question 3 that Smith currently suffered from
*incapacitating* panic attacks.  In any event, the ALJ was not free
to ignore an opinion from a treating physician, or to
mischaracterize the record by finding no clinical support for Dr.
Rouse's opinion that Smith was currently unable to engage in
substantial gainful activity due to incapacitating panic attacks.

Remand is required for legal error in the determination of
residual functional capacity by failing to accord a treating
source's opinion controlling weight, and if not according the
opinion controlling weight, addressing the opinion and specifying
the reasons why it would not be given controlling weight.  *See*
*id.*

Furthermore, the errors at step two and three infected the
determination of RFC.  RFC must be assessed based on all
medically determinable impairments, including those determined to
be not severe.  20 C.F.R. §§ 404.1545(a)(2), (e); 416.945(a)(2),
(e).  And although the ALJ recited standards for determining RFC,
his actual determination was a stock paragraph that offers no
discussion of the evidence of Smith's nonexertional limitations,
and concludes with the following statement:  "Thus, to the extent
that the claimant alleges impairments so severe as to preclude

all sustained work activity, the undersigned does not find her
fully credible." AR 14.  Such boilerplate has been roundly
condemned, and is no substitute for specific reasons for
discrediting specific allegations of restrictions or limitations
on one's ability to work.  *See* SSR 96-7p, 1996 WL 374186 at *2
(July 2, 1996); SSR 96-8p, 1996 WL 374184 at *7 (July 2, 1996);
*Parker v. Astrue*, 597 F.3d 920, 921-22 (7th Cir. 2010)
(condemning similar language as "meaningless boilerplate" that
"yields no clue to what weight the trier of fact gave the
testimony").  The ALJ's unsupported adverse credibility
determination further undermines the adequacy of the RFC
determination.

### C.   The Step Five Determination

At the disability hearing, the ALJ asked the vocational
expert to assume a worker who could perform an unskilled job
"that did not require someone to wait on the public."  AR 42.
The witness responded that a cleaner and a stockroom marker would
fit that description.  AR 42-43.  In his decision, however, the
ALJ made an RFC determination that Smith could perform a full
range of work at all exertional levels but with the nonexertional
limitations of unskilled work without public contact.  AR 13.  He
represented that he had asked the vocational expert whether jobs
exist in the national economy for an individual with an RFC that
did not involve any public contact, instead of for an individual

24

with the lesser limitation of not having to wait on the public. This likely inadvertent inaccuracy leaves the Court unable to determine whether the ALJ's determination at Step Five was supported by substantial evidence, however.  Although the cleaner and the stockroom marker may well not be required to wait on the public, there is no evidence that the jobs do not require public contact.  Moreover, the ALJ's hypothetical failed either to address additional limitations for which evidence existed in the record, or to explain his rejection of those limitations. "Testimony elicited by hypothetical questions that do not relate *with precision* all of a claimant's impairments cannot constitute substantial evidence to support an administrative law judge's decision to deny benefits."  *Montgomery v. Shalala*, 30 F.3d 98, 100 (8th Cir. 1994).

## D.   Failure to Consider the Ability to Perform Sustained Work Activities

Smith's remaining argument is that the ALJ failed to discuss her ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis.  Although the "discussion" of work-related activity that Smith could do is not extensive, the ALJ did not fail to consider this factor.

## IV.  Conclusion

In light of the ALJ's failure to consider relevant medical

25

evidence; failure to give good reasons for rejecting or ignoring opinions from treating sources; failure to consider the combined effect of all impairments, regardless of their severity, on Smith's ability to work; and selective discussion of the evidence, his determination that Smith is not disabled is not supported by substantial evidence.  Accordingly the motion to reverse the decision of the Commissioner is **granted**.  The motion for order affirming the decision of the Commissioner is **denied.**

Dated at Burlington, in the District of Vermont, this 20th day of December, 2011.

/s/ William K. Sessions III
William K. Sessions III
U.S. District Judge